**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

<u>Dwayne Hearns</u>

     v.                    Civil No. 05-cv-413-JL
                             Opinion No. 2008 DNH 180
<u>Warden, New Hampshire</u>
<u>State Prison</u>

**<u>ORDER</u>**

The pro se petitioner, Dwayne Hearns, seeks habeas corpus relief, <u>see</u> 28 U.S.C. § 2254 (2006), from his state court convictions for aggravated felonious sexual assault ("AFSA"), <u>see</u> N.H. Rev. Stat. Ann. § 632-A:2, I(j)(1)(Supp. 2001) (amended 2003), and simple assault, <u>see</u> N.H. Rev. Stat. Ann. § 631:2-a (1996). Hearns alleges four grounds in support of his position: (A) multiple instances of prosecutorial misconduct at trial, (B) the state trial court abused its discretion by compelling him to choose between his right to a speedy trial, and right to present certain exculpatory evidence, <u>see</u> U.S. Const. amend VI, (C) trial counsel provided constitutionally ineffective assistance, <u>see</u> U.S. Const. amend VI, and (D) the trial court improperly imposed consecutive sentences. U.S. Const. amends. V & XIV.

This court has jurisdiction over Hearns' petition under 28 U.S.C. § 1331 (2001) (federal question) and the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). <u>See</u> 28 U.S.C. § 2254(a).

1

The parties filed timely cross motions for summary judgment. See Fed. R. Civ. P. 56.  Additionally, Hearns requests a hearing and the Warden objects.  See 28 U.S.C. § 2254 Rule 8 (2007).  For the following reasons, the court grants the Warden's motion and denies Hearns' cross-motion.  Hearns' request for an evidentiary hearing is denied.  Hearns' petition for a writ of habeas corpus is likewise denied.


I.   **Standard of review**

Review of this petition is governed by the AEDPA mandate that a habeas relief will not be granted with respect to any state court adjudication unless it "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law."  28 U.S.C. § 2254(d)(1), see Price v. Vincent, 538 U.S. 634, 639-640 (2003).  A high degree of deference is accorded the state court decision.  Dugas v. Coplan, 506 F.3d 1, 6 (2007); cf. Horton v. Allen, 370 F.3d 75, 80 (1st Cir. 2004) ("if the petition presents a close call, it must be rejected, even if the state court was wrong").

Under this standard, a state court decision is "contrary to" established federal law "if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially

2

indistinguishable facts." <u>Castillo v. Matesanz</u>, 348 F.3d 1, 9
(1st Cir. 2003)(quotations and brackets omitted).

A state court adjudication involves an unreasonable
application of established law if the court correctly sets forth
the governing law, but unreasonably applies it to the facts of
the petitioner's case.  <u>McCambridge v. Hall</u>, 303 F.3d 24, 36 (1st
Cir. 2002).  "[T]he state court's determination must be
unreasonable, not simply incorrect, and unreasonableness is an
objective standard."  <u>Castillo</u>, 348 F.3d at 9; <u>see</u> <u>Sanna v.
Dipaolo</u>, 265 F.3d 1, 13 (1st Cir. 2001).  "[S]ome increment of
incorrectness beyond error is required. The increment need not
necessarily be great, but it must be great enough to make the
decision unreasonable in the independent and objective judgment
of the federal court."  <u>McCambridge</u>, 303 F.3d at 36 (quotations
and citation omitted); <u>see</u> <u>Creighton v. Hall</u>, 310 F.3d 221, 226
(1st Cir. 2002) (the test is whether the decision is "objectively
unreasonable" rather than "merely incorrect").

It is the petitioner's burden to show that the law was
unreasonably applied in his case, <u>Price</u>, 538 U.S. at 641, and "if
it is a close question whether the state decision is in error,
then the state decision cannot be an unreasonable application."
<u>McCambridge</u>, 303 F.3d at 36.  "[W]here reasoned application of
clearly established Supreme Court precedent to a particular set
of facts can lead to more than one outcome, the state court's

choice between those outcomes, whether right or wrong, cannot constitute a basis for habeas relief." <u>Sanna</u>, 265 F.3d at 13 (quotations and ellipses omitted).  Further, this court will not inquire whether the state court decision is well reasoned, but will focus instead on whether the outcome of that decision is reasonable.  <u>See</u>, <u>e.g.</u>, <u>Creighton</u>, 310 F.3d at 226.

The AEDPA mandates this review, however, only to issues that were adjudicated by the state court.  <u>See</u> 28 U.S.C. § 2554(d), <u>DiBenedetto v. Hall</u>, 272 F.3d 1, 6 (2001)(key trigger of AEDPA review is whether "claim" was "adjudicated on the merits"). Federal courts "can hardly defer to the state court on an issue that the state court did not address." <u>Fortini v. Murphy</u>, 257 F.3d 39, 47 (1st Cir. 2001).  As such, "[w]hen the state court has never addressed the particular federal claim at issue, federal review is de novo." <u>Dugas</u>, 506 F.3d at 7; <u>see</u> <u>Pike v. Guarino</u>, 492 F.3d 61, 67 (1st Cir. 2007).  However, because the purpose of AEDPA is to grant deference to state court adjudications, "[t]o trigger the AEDPA standard, the state court need not discuss the federal claim in detail." <u>White v. Coplan</u>, 399 F.3d 18, 23 (2005). "[A] mere recognition and rejection of the federal claim without any further discussion still invokes AEDPA deference."  <u>Id.</u>

Summary judgment is appropriate in habeas corpus proceedings "if the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as
to any material fact and that the movant is entitled to judgment
as a matter of law." Fed. R. Civ. P. 56(c); see Fed. R. Civ. P.
81(4), 28 U.S.C. § 2254 Rule 11 (2007). A genuine issue is one
"that properly can be resolved only by a finder of fact because
[it] may reasonably be resolved in favor of either party."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)
(decided under prior version of the rule). A material fact is
one that, under the prevailing substantive law, effects the
outcome of the case. Id. at 248.


II. **Background**

     "We describe the facts pertinent to the grounds of decision
as they were found by the state court, fleshed out by other facts
contained in the record and consistent with the state court
findings." See McCambridge, 303 F.3d at 26. This court is
"bound to accept the state court findings of fact unless [the
petitioner] convinces us, by clear and convincing evidence, that
they are in error." Id.; see Niland v. Hall, 280 F.3d 6, 11
(1st Cir 2002); Sanna, 265 F.3d at 7; 28 U.S.C. § 2254(e)(1).
"For this purpose, 'facts' are defined as basic, primary
historical facts:  facts in the sense of a recital of external
events and the credibility of their narrators." Sanna, 265 F.3d
at 7.

5

The procedural and factual history of this matter is complicated and Hearns challenges myriad rulings.  Thus, for purposes of clarity, this court will summarize the very basic background facts here and add specificity as needed in the analysis of each claim.  See United States v. DeCologero, 530 F.3d 36, 47 (1st Cir. 2008)("We trace the general contours of the case here and leave further recounting for the analysis of particular arguments").

In 2001, FB, a fourteen-year-old girl, was living with her mother in Maine.  The petitioner, Dwayne Hearns, who was formerly married to FB's mother, lived in Pittsfield, N.H.

FB's relationship with her mother was difficult and she was anxious to spend less time in her mother's home.  During that summer, FB wanted a job and got a position working with Hearns at a restaurant in Epsom.  At first, Hearns drove FB to and from the restaurant, but eventually she began sleeping at Hearns' apartment in Pittsfield.  It was during this time that FB alleges that Hearns committed the two counts of simple assault.  On August 10, 2001, FB's mother allowed her to move in with Hearns. FB alleges that Hearns committed the remaining four counts of aggravated felonious sexual assaults soon after.

At trial, the State's case rested primarily on the testimonial evidence provided by FB, and DNA evidence in the form of three "mixed samples" of DNA consistent with Hearns and FB

6

retrieved from a satin sheet found in Hearns' apartment.  The
defense countered with testimony challenging FB's credibility.
Counsel questioned her veracity by eliciting testimony from a
number of FB's friends that she hosted daytime parties attended
by multiple teenagers at the apartment while Hearns was at work,
despite her initial testimony that she spent the days virtually
alone.  The defense also introduced the testimony of a pair of
siblings[1] who testified that FB had fabricated the allegations of
assault in order to obtain Hearns' apartment and belongings.

Defense counsel also vigorously challenged the DNA evidence.
Counsel suggested that another source of the DNA consistent with
FB was her brother, NC, who sometimes stayed at the apartment.
The defense also challenged whether the satin sheet was actually
on the bed when the assaults occurred.  The defense argued to the
jury that the sheets were a serological "mess," and given the
number of teenagers present in the apartment that summer, the
State's DNA evidence could not be trusted.  The jury convicted
Hearns of two counts of simple assault and four counts of AFSA
and a series of state and federal appeals followed.

---

[1]  The siblings were acquaintances of FB and one was a cell
mate of Hearns after he was arrested.

III. <u>Analysis</u>

A.   <u>Prosecutorial misconduct</u>

Hearns contends that his due process rights were violated because the prosecutor, during closing arguments, committed multiple errors that rose to the level of misconduct justifying a new trial.  Improper argument violates a defendant's due process rights only if the argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  <u>Donnelly v. DeChristofaro</u>, 416 U.S. 637, 643 (1974); <u>see</u>, <u>e.g.</u>, <u>Olszewski v. Spencer</u>, 466 F.3d 47, 59 (1st Cir. 2006); <u>see</u> U.S. Const. amend XIV.  "The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecution."[2] <u>Amirault v. Fair</u>, 968 F.2d 1404, 1406 (1st Cir. 1992)(quotations and brackets omitted).  Therefore, habeas relief is warranted only if the prosecution's arguments to the jury were both improper and harmful.  <u>See</u>, <u>e.g.</u>, <u>United States v. Levy-Cordero</u>, 67 F.3d 1002, 1008 (1st Cir. 1995).  If statements are determined to be inappropriate, the First Circuit has set forth a list of factors to consider to determine whether the prosecutor's comments rendered the trial so unfair that the defendant's due

---

[2]   The Supreme Court has admonished courts not to grant relief in order to punish prosecutorial misconduct.  <u>See</u>, <u>e.g.</u>; <u>United States v. Vasquez-Botet</u>, 532 F.3d 37, 58 (1st Cir. 2008), <u>United States v. Auch</u>, 187 F.3d 125, 133 (1999).

process rights were denied.  <u>Olszewski</u>, 466 F.3d at 59.

Specifically, the First Circuit has directed that:

> [a]lthough we have used slightly varying terminology in
> describing these factors, the common denominators are
> (1) the severity of the misconduct; (2) the context in
> which it occurred; (3) whether the judge gave any
> curative instructions and the likely effect of such
> instructions; and (4) the strength of the evidence
> against the defendant.

<u>United States v. Manning</u>, 23 F.3d 570, 574 (1994); <u>see</u> <u>Olszewski</u>,

466 F.3d at 59 (severity of misconduct is viewed in terms of

intent and pervasiveness).

 Accordingly, this court will first review each claim of

impropriety, and, if misconduct is found, analyze whether those

errors so tainted the trial process that Hearns is entitled to a

new trial.[3]  <u>Cf.</u> <u>United States v. Wihbey</u>, 75 F.3d 761, 772-773

(1st Cir. 1996) (concluding that prosecutor's comment was

inappropriate, but concluding, after considering all the factors,

it did not rise to the level of a due process violation).

As a preliminary matter, Hearns asserts that <u>de novo</u> review

is proper, while the Warden assumes that the deferential standard

of review applies.  After a review of the record, the court

---

 [3]  In this case, Hearns contends that the prosecutor's
comments rendered his trial so unfair that his conviction was a
denial of due process.  This issue does not involve a violation
of a specific guarantee of the Bill of Rights, such as the Fifth
Amendment's guarantee against self incrimination, which would be
analyzed under a higher standard.  <u>United States v. Wilkerson</u>,
411 F.3d 1, 8-9 (1st Cir. 2005); <u>Wihbey</u>, 75 F.3d at 771  n. 6,
<u>see</u> <u>Donnelly</u>, 416 U.S. at 643.

concludes that although some of the claims of impropriety were adjudicated by the state courts for purposes of AEDPA review, many were not.[4]  It is unnecessary to painstakingly resolve the issue either way, because even under the more difficult de novo standard, the prosecutor's comments do not justify habeas relief. Therefore, the court will conduct the analysis under the de novo standard.  See Obershaw v. Lanman, 453 F.3d 56, 65-66 (1st Cir. 2006).


**a.   Claims of impropriety**

   **(i) Burden shifting**

   In his habeas petition, Hearns asserts that the prosecutor impermissibly shifted the burden of proof during his closing argument.  The New Hampshire Supreme Court, citing state law, concluded that this comment was improper, but was not so prejudicial as to warrant a new trial.  See State v. Hearns, 855 A.2d 549, 556-557 (N.H. 2004).

   During closing arguments, the prosecutor, while discussing FB's testimony stated:  "[s]he never wavered as to what that man did to her.  Did you notice the defense didn't even cross-examine her on it?  Why is that?  Why?"  (Trial Tr. Vol. 3, 67, October 24, 2002.)  The defense objected after the conclusion of closing

---

   [4]  Specifically, claim a.(i) was adjudicated for purposes of AEDPA, but claims a.(ii) through a.(iv) are ultimately reviewable under a de novo standard.

arguments, contending that the prosecutor had impermissibly

shifted the burden of proof.  Id. at 84-85.  Although the trial

court did not rule on the issue at that time, it gave the

following curative instruction:

> during the course of the State's argument in this case,
> an improper comment was made.  The State argued that
> you should somehow consider defense counsel's failure
> to cross-examine [FB] on several issues.  Please keep
> in mind that a defendant does not have to prove his
> innocence.  A defendant has no obligation to introduce
> any evidence whatsoever.  The burden of proof is on the
> State of New Hampshire to present evidence which
> convinces you beyond a reasonable doubt of the
> defendant's guilt on every element of the offenses
> charged.

Id. at 102.

On direct appeal, the New Hampshire Supreme Court concluded

that the comment was indeed improper.[5]  State v. Hearns, 855 A.2d

at 556-557.  This court agrees with the state court that this

comment impermissibly shifted the burden of proof.[6]

_____

[5]  The New Hampshire Supreme Court also concluded that a
mistrial was not warranted because it was an isolated infraction,
was cured by the trial court's instruction, and did not prejudice
the outcome of the case.  State v. Hearns, 855 A.2d at 556-557.

[6]  This court notes that the disputed remark was not a
comment on Hearns' Fifth Amendment right not to testify.  See
Wihbey, 75 F.3d at 769.  It was not "of such a character that the
jury would naturally and necessarily take it to be a comment on
the failure of the accused to testify."  Id. (Quotations
omitted.)  Rather, in the context of the trial, this comment
dealt solely with Hearns' alleged failure to make his case
stronger by cross-examining FB.  See Wilkerson, 411 F.3d at 8-9
(prosecutor's comments could not be taken as comment on failure
to testify but as failure to support his theory of the case).  As
such, it is not subject to higher standard on habeas review, see
Wihbey, 75 F.3d at 771 n.6.  Even assuming the statements did

It is well settled that a prosecutor must not suggest that a defendant has the burden of proving his innocence. See, e.g., United States v. Roberts, 119 F.3d 1006, 1015 (1st Cir. 1997). This type of argument can take many forms, for example, it is improper for the prosecution to ask if the defendant "can explain the story that would be different" from the prosecution, United States v. Skandier, 758 F.2d 43, 44 (1st Cir. 1985), or to suggest that the defendant has a responsibility to offer evidence or present a compelling case, Roberts, 119 F.3d at 1015; cf. Wilkerson, 411 F.3d at 8 (improper for prosecution to assert that defendant had burden to prove another set of facts).[7] Here, the prosecutor's comments were clearly intended to tell that jury that it was Hearns' responsibility to cross-examine FB about certain credibility issues and offer a plausible explanation about why he failed to do so.   This is simply a "how-does-he-explain" argument that is disfavored in this circuit. Skandier, 758 F.2d at 45.  Accordingly, this court concludes that this comment was improper. See Wihbey, 75 F.3d at 769-70

---

implicate a specific right such as the right against self incrimination, it would not be error because at most the comment was ambiguous, the jury was instructed about the proper burden of proof, and as discussed supra, there was significant evidence of guilt. Cf. Wilkerson, 411 F.3d at 9. Thus, it cannot be said that the guilty verdicts in this trial were attributable to this error. See Wihbey, 75 F.3d at 769.

[7] As will be discussed infra, contemporaneous curative instructions can correct an improper remark of this kind. See Roberts, 119 F.3d at 1015.

(impermissible burden shifting to suggest that defense counsel should "explain away" or offer alternative explanation).

### (ii) Improper Vouching

Hearns next contends that the prosecutor impermissibly used the prestige of his office to bolster his arguments at closing and improperly vouched for the credibility of FB.  Prosecutorial vouching occurs when the state puts the prestige of the government behind its case by imparting a personal belief in a witness's truthfulness or implying that a jury should credit certain evidence because the government is trustworthy.  See United States v. Vasquez-Rivera, 407 F.3d 476, 483 (1st Cir. 2005); United States v. Cruz-Kuilan, 75 F.3d 59, 62 (1st Cir. 1996).  "[A]ny representation as to the prosecutor's personal belief in the guilt of the accused is improper."  United States v. Smith, 982 F.2d 681, 684 (1st Cir. 1993).  Improper vouching does not occur, however, when the prosecutor asks the jury to make certain inferences from the evidence, United States v. Perez-Ruiz, 353 F.3d 1, 10 (1st Cir. 2003); Smith, 982 F.2d at 683, or argues that a witness has reasons to testify truthfully without resort to the prestige of the office.  See Perez-Ruiz at 10; Cruz-Kuilan, 75 F.3d at 62.  Although the line between legitimate argument and improper vouching "is often a hazy one," United States v. Innamorati, 996 F.2d 456, 483 (1st Cir. 1993),

in this instance, this court concludes that the prosecutor's statements were improper.

Hearns references numerous statements in the prosecutor's summation to make his claims of impropriety. He contends that the prosecutor improperly used the pronoun "we" multiple times when summarizing the evidence presented at trial, thus placing the prestige of his office behind the evidence and improperly vouching for FB's credibility.

First, he contends that it was improper for the prosecutor to use the pronoun "we" during closing.  For example, when discussing FB's testimony about the specifics of the alleged assaults the prosecutor stated:

> [l]et's talk about why if you believe her you should convict.  Well, she's given you testimony.  She's given you evidence.  She's given you the elements of each crime and every crime.  She has told you about four different events. . . . [The prosecutor describes specific testimony about the assaults.]  Those are simple assaults.  *We know* it was unprivileged physical contact.  She didn't want it to happen and she communicated that.  And *we know* he did it knowingly.

(Trial Tr. Vol. 3, 60-61 (brackets and emphasis added).)

Further, when discussing the elements of the crime, he stated:

> *[w]e know* from the evidence in the case she's between 13 and 16 years of age.  *We know* she's not married to him.  *And we know* . . . that she was living with him. . . .  So you have from her all of the evidence that you need to convict if you believe her.

Id. at 62 (brackets and emphasis added).  Later, when discussing jury instructions he stated:

14

> [t]he Judge's instruction that the word of the
> victim does not need to be corroborated, and the
> reason is *because we understand* that these types
> of crimes occur in secret. . . . And *we know* it
> does not need to be corroborated *because we know*
> that sometimes these things are not reported for a
> while.

Id. at 62-63 (brackets and emphasis added).

Later, the prosecutor stated:

> . . . if you believe her, you should convict.  It's as
> simple as that.  Why should *we believe* her? . . . Why
> should *we believe* her?  The Judge just gave you a
> number of different criteria to look to, to judge
> people's credibility.  You do this each and every day
> using your common sense and judgment.  You do this.
> You look at a person and decide whether they are
> telling the truth.  But if *we think* about specific
> things in this case, *we recognize* that she's telling
> the truth about what he did to her.

Id. at 63 (emphasis added).

Finally, when discussing FB's motives the prosecutor stated that "one of the things *we* always take into account . . . is the motive to lie," id. at 64 (emphasis added), and later that "*we* have heard no evidence whatsoever that there is any motive for her to falsely accuse that man."  Id. at 66 (emphasis added).[8]

Although the prosecutor's statements were not "vouching" in the traditional sense, they were improper because by using the term "we", he was not only putting the prestige of his office behind the evidence, see Auch, 187 F.3d at 131 (noting that use

---

[8]  Hearns also takes issue with one "we" statement that is clearly not improper.  That statement simply concerns the order of his summation in that he told the jury "We'll talk more about Nick in a little bit."  (Trial Tr. Vol. 3, 62.)

of "I think" or "I can even imagine" to impart personal belief is
improper); <u>United States v. Gonzalez Vargas</u>, 558 F.2d 631, 632
(1st Cir. 1977)("I believe" or "I have proven" is improper), but
he was inviting the jury to become part of the prosecutorial
team.  The prosecutor's tactic in this case, "[w]hile not
vouching in the most familiar sense, . . . does invite the jury
to rely on the prestige of the government . . . rather than the
jury's own evaluation of the evidence; to this extent the
argument presents the same danger as outright vouching." <u>United
States v. Torres-Galindo</u>, 206 F.3d 136, 142 (1st Cir. 2000).  The
key problem here is that the prosecutor's comments were not
simply declarative statements about the evidence presented by the
prosecution at trial (for example "we played you a tape"), but
were comments on the evidence where the "we" clearly referred to
the prosecutor and the jury as a single entity evaluating
elements of the offense or the credibility of witnesses (for
example "we know he did it knowingly" or "why should we believe
her" or "we recognize that she's telling the truth").  This is
improper.  <u>See</u> <u>Auch</u>, 187 F.3d at 131 (although argument did not
use the prohibited "I think" language, it conveyed a personal
opinion to the jury and was improper).

Next, he contends that the state impermissibly bolstered
FB's credibility through a series of statements where he used the

16

term "we"[9] when discussing FB's testimony.   It is improper for a
prosecutor to impart his personal belief that a witness is
credible, although it is permissible to urge the jury draw that
conclusion on the basis of the evidence.   See e.g., Smith, 982
F.2d at 683-84.   Hearns takes issue with the statements that
"*[w]e've told you* [FB] really has no motive to lie about what she
said that man did to her . . . ."   (Trial Tr. Vol. 3, 69
(emphasis added).)   Further, when discussing why FB would chose
to remain at Hearns' apartment after the assaults started, the
prosecutor stated "given the situation, given the fact that she
recognized that it was either put up with this or perhaps go
home, it makes sense given *who we know* Felicia is . . . ."   Id.
at 73 (emphasis added).   Finally that "[t]he version of events is
credible given *who we know* she is.   She's a troubled kid."   Id.
at 75 (emphasis added).   Again, this is clearly improper
argument.   The essential objection to vouching is it risks
distracting the jury from its "assigned task of assessing
credibility based solely on the evidence presented at trial and
the demeanor of the [witnesses]."   Perez-Ruiz, 353 F.3d at 10.

---

[9]   Hearns also contends that a series of seven declarative
statements made by the prosecutor also impermissibly bolstered
FB's credibility.   See Hearns Mem. of Law in Supp. of Claims
1,2,3, at 7.   Because this court concludes that these statements
were simply asserting reasonable inferences from the evidence at
trial, they were not improper.   See United States v. Martinez-
Medina, 279 F.3d 105, 119 (1st Cir. 2002) (no impropriety where
comment provides a reason, not a personal assurance, why the jury
should believe a witness, there was no misconduct.)

Again, the prosecutor was not only putting the prestige of his
office behind FB's credibility, but, with the exception of his
first statement, inferred that he and the jury act as a unit in
concluding that she was telling the truth.  This is improper.  <u>See</u>
<u>id.</u>

**(iii) <u>Misrepresentation</u>**

Hearns next asserts that in his closing, the prosecutor
impermissibly misrepresented:  (1) FB's testimony regarding the
alleged assaults, and (2) the DNA evidence presented at trial.
It is improper for a prosecutor to comment on facts not in
evidence, <u>see</u> <u>Auch</u>, 187 F.3d at 129, or misrepresent evidence
actually presented at trial.  <u>Donnelly</u>, 416 U.S. at 646.  Such
comments are improper because they "may profoundly impress a jury
and have significant impact on the jury's deliberations."  <u>Id.</u>

First, Hearns asserts that the prosecutor misrepresented the
evidence at trial when he stated that FB "never wavered as to
what that man did to her. . . . She didn't waver," (Trial Tr.
Vol. 3, 67), and asked "[d]id she embellish or exaggerate?  Isn't
that what liars do?  They embellish or exaggerate."  <u>Id.</u> at 67-
68.  He contends that these statements are improper because there
were inconsistencies in her statements to investigators before
trial regarding the number of times she was allegedly assaulted[10]

_____

[10]   The inconsistencies cited by the defendant concern the
number of assaults (ranging from zero to ten, or "a few" to

18

and that the prosecutor's statements implied that she had given a consistent account of the number of alleged assaults throughout the investigatory process.

Although the Warden, in his motion, concedes that the number of incidents FB claimed occurred changed over the course of the investigation, Hearns' claim is without merit.  A prosecutor's comments cannot be viewed in a vacuum, and must be analyzed in the context they were presented.  Cf. United States v. Robinson, 485 U.S. 25, 33 (1988) (stating general principle that prosecutors comments must be viewed in context).  The full text of the statements were as follows:

> Some of the things the Judge talked about is the appearance of the witness, the attitude of the witness, the behavior on the stand, the way the witness testified.  She never wavered as to what that man did to her.  Did you notice the defense didn't even cross-examine her on it?  Why is that?  Why?[11]  She didn't waver.  It became difficult for her to talk about it, but she told you what he did to her.
>
>         . . .
>
> Did she embellish or exaggerate?  Isn't that what liars do?  They embellish or exaggerate.  She gave you versions of these things that were very brief, very specific, but very brief.

---

"countless") and whether they occurred before or after FB moved in with Hearns.  At trial, FB testified to three specific incidents.

    [11]  As discussed supra, the statements about the defense's failure to cross-examine FB improperly shifted the burden of proof to the defense.

(Trial Tr. Vol. 3, 67-68.)  Here, the prosecutor was not implying that her story had been consistent throughout the investigation, rather, he was specifically referring to her statements and demeanor at trial.  Prosecutors are allowed to suggest that the jury make reasonable inferences from the evidence at trial. United States v. Hernandez, 218 F.3d 58, 68 (1st Cir. 2000); see Obershaw, 453 F.3d at 66.  It is permissible to "call[] on the jury to employ its collective common sense in evaluating the evidence and to draw reasonable inferences therefrom." Hernandez, 218 F.3d at 68.  The comments at issue simply asked the jury to draw an inference of credibility from the demeanor of FB during her testimony and was not improper.  Id., see Obershaw, 453 F.3d at 66 (comment that defendant lied was proper because prosecutor was "simply urging the jury to draw a particular conclusion from the evidence").[12]

Hearns next asserts that the prosecutor mischaracterized the DNA evidence presented by a criminalist with the New Hampshire

---

[12]  This case is easily distinguishable from Washington v. Hofbauer, 228 F.3d 689, 700 (6th Cir. 2000), relied on by Hearns. There, the prosecutor stated that a victim of sexual assault's account never changed during conversations with multiple individuals.  The court found error because during trial, the prosecutor elicited no testimony on the specifics of a least three of four conversations noted during closing.  Id. at 700-01. Here, the comments do not refer to specific conversations with others that were not part of the trial record, rather, they concern the demeanor of FB at trial.

State Police Forensic Laboratory.   In his closing, the prosecutor made the following statements about the DNA evidence:

> What was interesting is those semen stains, if you remember, when they looked at them, were part of the nonsperm fraction, remember, which is consistent with an individual who has had a vasectomy.  We learned it was his bed.  They basically found the semen stains were consistent with his DNA. . . . His DNA comes back from the semen.  Oh, you know what?  It is consistent for hers as well.  When the stains were tested, a mixed sample was found.  The DNA was consistent with his DNA and the other source was consistent with hers.

(Trial Tr. Vol. 3, 70-71.)  Essentially, Hearns contends that "the DNA evidence was at best inconclusive," and thus, the prosecutor's statement that the DNA found was consistent with Hearns was "false and misleading" and constituted prosecutorial misconduct.  See Hearns Mem. of Law in Supp. of Claims 1, 2, 3, at 13.

Although it is misconduct for a prosecutor to misrepresent facts in evidence, Donnelly, 416 U.S. at 646, Hearns' argument is without merit.  A prosecutor has the prerogative to summarize facts supported by the record and argue reasonable inferences to the jury.  United States v. Martinez-Medina, 279 F.3d 105, 119 (1st Cir. 2002).  Here, the prosecutor was summarizing the DNA expert's testimony regarding three semen stains found on Hearns' bed sheets.  See Obershaw, 453 F.3d at 66 (proper to summarize evidence at trial).  During trial, the criminalist testified that there was a "mixed sample" of DNA consistent with Hearns and FB, (Trial Tr. Vol. 1, 185, 187), and that there were three semen

21

stains consistent with Hearns. _Id._ at 187-88.   Further, the
criminalist testified that when she analyzed the seminal
material, "I was not able to find any spermatozoa," _id._ at 183,
but that "[s]ometimes if you do not have sperm present, for
instance, sometimes a male cannot produce sperm, or if he's
vasectomized." _Id._ at 184.   Accordingly, because the prosecutor
was fairly summarizing testimony at trial, Hearns' allegation of
misconduct is without merit.   _See_, _e.g._, _Martinez-Medina_, 279
F.3d at 119 (prerogative of prosecutor to characterize evidence
presented at trial and argue inferences therefrom); _Hernandez_,
218 F.3d at 68.

### (iv) **Appeal to juror's emotions**

Hearns next contends that the prosecutor impermissibly
appealed to the emotions of the jurors such that they were unable
to impartially decide his guilt or innocence.   It is well settled
that "arguments urging a jury to act in any capacity other than
as the impartial arbiter of the facts in the case before it are
improper." _Manning_, 23 F.3d at 574.   This court concludes,
however, that the prosecutor's comments in this instance were
permissible.

During the final moments of the prosecutor's closing, he
stated:

> [n]o one was there to protect [FB] from that man's
> manipulation and from that man's taking advantage of a

> situation.  No one was there to protect her.  But you
> are here now.  You can tell her by your verdict that
> you believe her, that what he did to her was a crime.
> You can tell him that you recognize this is a crime,
> you know what happened and you're not going to tolerate
> taking advantage of children in our society.

(Trial Tr. Vol. 3, 82-83.)

Defense counsel objected and requested a mistrial with prejudice.  The trial court denied the defendant's motion, concluding that "[i]t was not a direct appeal to sympathy."  Id. at 94.  The court saw the prosecutor's comments as "a request to the jurors to do the job as the State saw it under their role which is to take the evidence, evaluate it and apply the law." Id.  On appeal, the New Hampshire Supreme Court concluded that:

> [n]othing in the prosecutor's comments urged the jury
> to send a message, nor did the prosecutor play on the
> personal fears of the jurors concerning child
> molestation . . . .  Rather, the prosecutor simply
> urged the jury to do its job - determine whether the
> victim was credible and, therefore, whether the
> defendant was guilty.

State v. Hearns, 855 A.2d at 556 (quotations omitted).

It is well settled that during summation a prosecutor may not appeal to the passions or prejudices of a jury.  See United States v. Nelson-Rodriquez, 319 F.3d 12, 39 (1st Cir. 2003), Martinez-Medina, 279 F.3d at 119.  The Supreme Court has long "counseled prosecutors to refrain from improper methods calculated to produce a wrongful conviction . . . the adversary system permits the prosecutor to prosecute with earnestness and vigor . . . while he may strike hard blows, he is not at liberty

to strike foul ones." <u>United States v. Young</u>, 470 U.S. 1, 7
(1985)(citations, quotations, and ellipses omitted).  The law in
this circuit is clear that "[a] prosecutor must refrain from
attempting to deflect the jury's attention from the narrow issue
of the defendant's guilt or innocence; any attempt to foist onto
the jury responsibility for the extrajudicial consequences of a
not-guilty verdict is improper." <u>Auch</u>, 187 F.3d at 132; <u>see</u>
<u>Martinez-Medina</u>, 279 F.3d at 119 (improper to appeal to jury's
role as conscience of community).

The government is not, however, restricted from arguing its
case vehemently and is not required to remain stoic or deliver
argument impassively.  <u>Cf.</u> <u>Nelson-Rodriquez</u>, 319 F.3d at 39 ("let
us make sure that . . . not one kilogram of cocaine more is
imported into Puerto Rico by these seven defendants" was not
improper).  "Closing arguments traditionally have included
appeals to emotion.  The outer limit on emotional appeals is
generally stated as a prohibition against arguments calculated to
inflame the passions or prejudices of the jury." <u>Id.</u>

Applying a <u>de novo</u> standard, this court concludes that the
prosecutor's statements, although close to the line,[13] were not

---

[13]  This court is troubled by the prosecutor's statement
during a subsequent bench conference that "there is nothing wrong
with saying that by their verdict, they are telling her that they
believe her and *there is nothing wrong sending a message to the
community in any way shape or form*.  I'm saying based on the
evidence, tell him that you recognize what he did and that what
he did was a crime."  (Trial Tr. Vol. 3, 86 (emphasis added).)

impermissible.  Here, the prosecutor was not exhorting the jury
to send a message to the greater community, but rather was
permissibly arguing that if they found FB credible, then the
result was that FB would understand that they believed her and
that Hearns would understand the consequences of his actions.
The prosecutor did not "impose a duty to decide one way or the
other," United States v. Mandlebaum, 803 F.2d 42, 44 (1st Cir.
1986), and as such, did not "distract [the] jury from its actual
duty:  impartiality."  Id.

    Further, these comments were not the type of flagrant
appeals to emotion that the First Circuit has found problematic.
See generally, Vazquez-Botet, 532 F.3d at 58.  It did not enlist
the jury to be crime fighters, see United States v. Arrieta-
Agressot, 3 F.3d 525, 527-28 (1st Cir. 1993), or ask them to
protect the community by a guilty verdict, see United States v.
Whiting, 28 F.3d 1296, 1302 (1st Cir. 1994); United States v.
Moreno, 991 F.2d 943, 947 (1st Cir. 1993).  Further, the comments
did not traverse into obviously forbidden territory like
conjuring up images of religious duty.  Cf. Levy-Cordero, 67 F.3d
at 1008.

---

Counsel should note that this circuit found error where the
prosecutor urged the jury to "[t]ake responsibility for your
community" by convicting the defendant.  Manning, 23 F.3d at 572-
73.  Although the prosecutor's stated belief is a concern, this
court must analyze the issue in the context of comments actually
heard by the jury.  In that setting, the court finds no error.

Rather, "[i]n this case, the prosecutor's remarks were confined to how [the parties] would react . . . ." and were thus not improper comment. <u>Auch</u>, 187 F.3d at 133 (concluding that comment that if jury found defendant not guilty, he would be "laughing at you.  He would be laughing all the way to the bank" was not sufficiently flagrant to require reversal, even if possibly improper).  Simply put, FB would understand that she testified credibly, and Hearns would understand that his actions were criminal and not sanctioned by the jury.  The statements did not distract the jury from the issue of deciding whether the evidence was sufficient to find Hearns guilty.  Accordingly, this court concludes these statements did not constitute prosecutorial misconduct.

## b.  <u>Effect of misconduct</u>

Even though the court has concluded that the prosecutor impermissibly shifted the burden of proof and engaged in improper vouching,[14] this court is required to determine whether these misstatements "so infected the trial with unfairness as to make the resulting conviction a denial of due process." <u>Obershaw</u>, 453

---

[14]  Hearns also objects to the introduction of paper towels containing evidence of nasal secretions and possibly semenal material, even though the paper towels were excluded from evidence pretrial.  This argument fails because it could have no impact on the outcome of the case.  The bodily fluids were never identified as to type or source and thus created no significant inference to the guilt or innocence of Hearns.

F.3d at 65.  "It is not enough that the prosecutors' remarks were undesirable or even universally condemned to constitute a violation of the defendant's due process rights."  Darden v. Wainwright, 477 U.S. 168, 181 (1986); see Obershaw, 453 F.3d at 66.  Even where multiple instances of improper summation occur, due process is violated only if the improper arguments "had substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 637, (1993) (quotations omitted).  In this case they did not.[15]  Cf. Martinez-Medina, 279 F.3d at 118 (in a direct appeal, although prosecutor made several improper remarks, new trial not warranted).

Even if the prosecutor's arguments were improper and had been deliberate and pervasive, see Olszewski, 466 F.3d at 59 (factors to consider include whether the statements were isolated or deliberate), there would be no basis to conclude that they had a substantial effect on the jury's verdict because the testimonial and physical evidence of Hearns' guilt was so strong.[16]  See id. at 61 (any prejudice outweighed by strength of

---

[15]  As noted supra, although I conclude that there were instances of misconduct, I remain mindful of the Supreme Court's admonition that it is improper to order a new trial "simply to punish prosecutorial misconduct."  Vasquez-Botet, 532 F.3d at 59.

[16]  Further, at Hearns' request, the court instructed the jury on the proper burden of proof, thus dulling the prejudicial effect of at least the prosecutor's comment regarding the cross-examination of FB.  Cf. Roberts, 119 F.3d at 1015 (instructions can be sufficient to cure).

government's evidence).  "The strength of the case against the
defendant often is the most significant factor to be balanced
against prosecutorial misconduct."  Smith, 982 F.2d at 684; cf.
Darden, 477 U.S. at 182 (no relief based on improper argument
where evidence of guilt was heavy); Moreno, 991 F.2d at 948
(despite "patently improper" remarks, no prejudice where case
against defendant was "ample").  First, the DNA evidence
presented at trial revealed the presence of three separate mixed
samples stains of DNA consistent with both Hearns and FB.  The
DNA expert testified that one explanation for such mixed samples
was sexual intercourse, and that the concentration of DNA present
could not be left by casual contact, but sexual intercourse.  The
multiple stains and resulting inference of sexual intercourse
between FB and Hearns strongly supports the state's case and
renders less problematic any misstatements by the prosecutor.
Cf. Olszewski, 466 F.3d at 61 (strength of government's evidence
outweighed effect of misstatements).

Further, FB gave vivid and detailed testimony about the
assaults.  Cf. Malone v. Clark, 536 F.3d 54, 65 (1st Cir. 2008)
(finding no prejudice in the ineffective assistance context,
despite lack of physical evidence where victim in a sexual
assault case gave a descriptive account of the abuse).  Other
witnesses corroborated her testimony regarding the eventual

reporting of the assaults.[17]  Because the evidence at trial

strongly supported a guilty verdict, see Vazquez-Botet, 532 F.3d

at 58 (court found no prejudice in an extortion case where

government's case included testimony of multiple witnesses and

documentary evidence), there is no basis to conclude that Hearns

was denied due process even if the court deemed the prosecutor's

summation to be improper.  The Warden is granted summary judgment

on this issue and Hearns' motion for summary judgment is

accordingly denied.  Cf. Amirault, 968 F.2d at 1406 (no habeas

relief despite extensive list of misconduct because petitioner

failed to make a showing that fairness of trial compromised).


**B.    Exculpatory evidence**

     Hearns next asserts that the trial court abused its

discretion when it denied his motion, within days of the

scheduled start of trial, to offer evidence, in the form of

testimony of two witnesses, of alternative sources of the DNA

found on bed sheets in the apartment.  The court ruled that it

would grant Hearns' motion only if the State was allowed time to

_____

     [17]  As discussed, infra, the defense tried to undermine FB's
credibility by eliciting testimony from two witnesses that FB and
her brother planned to fabricate the allegations of sexual abuse.
Thus, it is clear that the jury, which had the opportunity to
observe and evaluate each witness, decided the question of
credibility in favor of a guilty verdict and the court cannot
easily discount that determination.  Cf. Malone, 536 F.3d at 65
(in evaluating strength of government's case, court viewed jury's
credibility determination with great deference).

conduct further testing on the bed sheets.  Hearns' counsel
objected, contending that he was being forced to choose between
his constitutional right to a speedy trial and right to present
exculpatory evidence, see U.S. Const. amend. VI.  Accordingly,
Hearns asserts in his petition that because the court conditioned
admissibility on granting the State a continuance, he was
impermissibly required to choose between two constitutional
rights, requiring habeas relief.[18]  This claim also fails.

---

[18]  Hearns' habeas petition alleges that his rights were
violated because the two witnesses who he hoped would offer
alternative source evidence were also going to testify that FB
and her brother fabricated the allegations of sexual abuse in
order to steal Hearns' apartment and personal belongings.  That
testimony was eventually presented at trial by the two witnesses.
This claim of error based on evidence that FB has a motive to lie
is therefore without merit.

Further, in his motion for summary judgment, Hearns contends
that the trial court's refusal to introduce this evidence
affected his right to a fair trial.  This claim has no merit.
First, the court did not issue a blanket denial.  He was given
the opportunity to present the evidence had he agreed to the
continuance.  See Taylor v. Illinois, 484 U.S. 400, 413
(1988)(noting that granting a continuance to provide the
prosecution time for investigation is an option to preclusion
where there is a late submission of evidence.)  Further, this
claim was not presented in his habeas petition.  Rather, Hearns
claimed only that being required to choose between a continuance
and introduction of the evidence violated his constitutional
rights.  Accordingly, the claim that he was impermissibly forced
to choose between constitutional rights was accepted by the Judge
Magistrate, see Hearns v. Warden, 05-cv-413 (D.N.H. May 2, 2007)
and this ruling was not objected to by Hearns.  Accordingly, this
court will not now address his additional claim that his fair
trial rights were violated by improper exclusion of this
alternative source evidence.

As a preliminary matter, this court reviews this claim on a
de novo basis.  As already noted, the deferential AEDPA standard
of review applies only to claims that were "adjudicated on the
merits" in the state court, see 28 U.S.C. 2554(d); DiBenedetto,
272 F.3d at 6; otherwise, review by this court is de novo.  Id.;
see, Dugas, 506 F.3d at 7; Pike, 492 F.3d at 67.  In this case,
it is not clear that the state courts adjudicated Hearns' federal
claim.  Although the trial court noted the defendant's exception,
the Supreme Court on direct appeal only addressed the state
constitutional claim, even though Hearns arguably raised it in
his pro se brief.  See State v. Hearns, 855 A.2d at 559-60.  The
federal constitutional claim was raised in Hearns' motion for a
new trial, but the trial judge's order states only that "several
of the defendant's claims of error by the court have already been
considered by the Supreme Court and rejected."  State v. Hearns,
Nos. 01-S-1189 et al., Order - Mot. for New Trial (N.H. Superior
Court 8/8/05).  Hearns' discretionary appeal of that ruling was
likewise summarily rejected.  State v. Hearns, No. 2005-0644,
Order (N.H. Supreme Court 10/28/05).  The First Circuit has held
that AEDPA's deferential standard of review does not apply where,
as here, a petitioner raises a federal claim before the state
court, but that claim was left unresolved.  Horton, 370 F.3d at
80.  We thus review this issue de novo.  DiBenedetto, 506 F.3d at
7.

31

Although this court's review of this claim is de novo, AEDPA requires "a separate and exacting standard applicable to review of a state court's factual findings," Pike, 492 F.3d at 67.  The state court's findings are presumed correct unless Hearns can "rebut the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  Shortly before trial, Hearns filed an untimely motion pursuant to New Hampshire Superior Court Rule 100-A[19] seeking to offer testimony of two friends of FB, namely "BB" and "SB", that there had been sexual activity between FB and her boyfriend in Hearns' apartment while he was a work.  The State, at trial, offered testimony of a criminalist with the New Hampshire State Police Forensic Laboratory that bed sheets from Hearns' apartment contained a mixed sample of Hearns' semen and FB's DNA that was consistent with sexual intercourse.  The defense intended to offer testimony of BB and SB about FB's alleged sexual activity as an alternative source of FB's DNA on the bed sheets.  During the hearing, the State requested more time to conduct testing on the bed sheets

---

[19]  New Hampshire Superior Court Rule 100-A states in pertinent part:  "Not less than forty-five (45) days prior to the scheduled trial date, any defendant who intends to offer evidence of specific prior sexual activity of the victim with a person other than the defendant shall file a motion setting forth with specificity the reasons that due process requires that he offer such evidence . . . .  If the defendant fails to file such a motion, he shall be precluded from relying on such evidence, except for good cause shown."  It is uncontested that Hearns' motion was submitted less than 45 days before trial.

and to prepare to question the witnesses.  When the trial court indicated that it was inclined to grant a continuance, the defense objected, contending that the defendant did not want any more delay in the start of trial and therefore, the court's proposed order would "force him to give up one right that he has in order to exercise another right he has . . . in violation of . . . his right to speedy trial and his right to due process." (Mot. Hr'g Tr. at 7.)  The trial court ruled:

> I've heard nothing to indicate that the evidence which the State was presented with at the last minute could not have been obtained earlier and presented to them in a timely fashion not necessitating a continuance.  But to maintain any sense of fairness to the State, they would have to have time to be entitled to rebut such evidence to fully investigate it.  They were as well not aware of the other witnesses who potentially would corroborate or deny these matters.  Therefore, if the defendant elects to proceed to trial as scheduled on Monday, the defendant will not be allowed to introduce evidence of potential alternative sources of the DNA.

(Mot. Hr'g Tr. at 12.)  The defendant elected to continue with the trial as scheduled and as such, the alternative source evidence was not admitted into evidence.[20]

Hearns contends that his situation mirrors that in <u>Simmons v. United States</u>, 390 U.S. 377, 394 (1968), where the Supreme Court found that the defendant was impermissibly forced to choose

---

[20]  Although there was no testimony regarding FB's sexual activity, there was evidence presented at trial that there were many teenagers at the apartment, including FB's brother, and the defense argued at closing that therefore, "there's a lot of possibility of [DNA] transfer from different people." (Trial Tr. Vol. 3, 50.)

between his Fifth Amendment right against self incrimination and
his Fourth Amendment Right against unlawful search and seizure
when he was forced to testify during a suppression hearing in
order to establish standing.  The Court found it "intolerable
that one constitutional right should have to be surrendered in
order to assert another."  Id.; see United States v. Doe, 628
F.2d 694, 696 (1st Cir. 1980).

In this case, however, Hearns did not face the
constitutional "Hobson's choice" that the Supreme Court found so
offensive.  See Simmons, 390 U.S. at 391.  The rights at issue
are of a different nature, cf. United States v. Melanson, 691
F.2d 579, 584 (1st Cir. 1981) (finding no violation of the
"Simmmons Rule" in part because right at issue is not absolute)
and, unlike Simmons, the dilemma was, in part, of the defendant's
own making.

It is informative to briefly describe the constitutional
landscape underlying Hearns' claim.  "Whether rooted directly in
the Due Process Clause of the Fourteenth Amendment, or in the
Compulsory Process or Confrontation Clauses of the Sixth
Amendment, the Constitution guarantees criminal defendants a
meaningful opportunity to present a complete defense."  Crane v.
Kentucky, 476 U.S. 683, 690 (1986)(citations and quotations
omitted)(relying on Chambers v. Mississippi, 410 U.S. 284, 302
(1973); Washington v. Texas, 388 U.S. 14, 23 (1967); Davis v.

34

<u>Alaska</u>, 415 U.S. 308, (1974) and quoting <u>California v. Trombetta</u>, 467 U.S. 479, 485 (1984)).  Due Process entitles a defendant to the fair opportunity to mount a defense against the State's accusations, <u>see</u> <u>Chambers</u>, 410 U.S. at 294, and although "[t]he Constitution guarantees a fair trial through the Due Process Clauses, . . . it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment." <u>Strickland v. Washington</u>, 466 U.S. 668, 684-685 (1984).[21]  These rights, however, are not absolute.  <u>See</u> <u>Chambers</u>, 410 U.S. at 295 (confrontation rights may appropriately "bow to accommodate other legitimate interests in the criminal trial process"), <u>Taylor</u>, 484 U.S. at 410-11 (Compulsory Process Clause of the Sixth Amendment does not grant defendants the unfettered right to offer testimony), <u>Levy-Cordero</u>, 67 F.3d at 1012-13.  "The adversary process could not function effectively without adherence to rules of procedure that govern the orderly presentation of facts and arguments to provide each party with a fair opportunity to assemble and submit evidence to contradict or explain the opponent's case."  <u>Taylor</u>, 484 U.S. at 410-11.  In fact, the Supreme Court determined that failure to comply with the notice-and-hearing requirements of state rape shield statutes may even

---

[21]   The relevant provisions of the Sixth Amendment provide: "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, . . . to be confronted with witnesses against him; to have compulsory process for obtaining witnesses in his favor, . . . . " U.S. Const. amend VI.

justify preclusion of probative evidence.  <u>Michigan v. Lucas</u>, 500

U.S. 145, 152-53 (1991).  Thus, trial courts may constitutionally

impose reasonable restrictions on a defendant's right to present

evidence in the interest of maintaining an orderly and fair trial

process.  See <u>Lucas</u>, 500 U.S. at 149;  <u>Taylor</u>, 484 U.S. at 410-11.

Similarly, although the Sixth Amendment provides that "[i]n

all criminal prosecutions, the accused shall enjoy the right to a

speedy and public trial," a defendant's right to a speedy trial is

not absolute.  <u>See</u> <u>Doggett v. United States</u>, 505 U.S. 647, 651

(1992)(despite breadth of language, the Supreme Court has

qualified the scope of the right); <u>Barker v. Wingo</u>, 407 U.S. 514,

522 (1972)(speedy trial right is necessarily relative and does not

"preclude the rights of public justice").[22]  A defendant cannot

claim constitutional error where the delay is a result of his own

actions.  <u>See</u> <u>Rashad v. Walsh</u>, 300 F.3d 27, (1st Cir. 2002); <u>cf.</u>

<u>Barker</u>, 407 U.S. at 529.  In fact, the Supreme Court's "speedy

trial standards recognize that pretrial delay is often both

inevitable and wholly justifiable.  The government may need time

to collect witnesses against the accused, oppose his pretrial

_____

[22]  The Supreme Court, in <u>Barker v. Wingo</u> developed a four
part balancing test to evaluate speedy trial claims.  <u>Barker</u>, 407
U.S. at 530-33.  Specifically whether:  (1) the delay was
unusually long, (2) the state or defendant is responsible for the
delay, (3) the defendant asserted his right, and (4) whether the
defendant was prejudiced by the delay.  <u>See</u>, <u>e.g.</u>, <u>Doggett</u>, 505
U.S. at 651.

motions or, if he goes into hiding, track him down." Doggett, 505 U.S. at 656.

Hearns' claim that he was forced into making what he viewed as an unacceptable choice is without merit because the choice was not fundamentally unfair, and was necessitated by his own actions. First, even though Hearns' disclosure of new witnesses was untimely under Superior Court Rule 100-A, the trial court did not reject Hearns' motion outright, but, out of fairness to the prosecution, appropriately conditioned the testimony on a continuance. See United States v. Scheffer, 523 U.S. 303, 308 (1991)(alternative options to exclusion are usually appropriate); Taylor, 484 U.S. at 413 (noting that granting a continence to the prosecution when faced with late disclosure of a witness is appropriate); cf. Lucas, 500 U.S. at 150 (noting that rape shield notice requirements protect against surprise to the prosecution).

Further, the right under the Compulsory Process Clause to present testimony to rebut the state's case lies uniquely with the defendant. Taylor, 484 U.S. at 410. "The very nature of the right requires that its effective use be preceded by deliberate planning and affirmative conduct." Id. Here, Hearns wanted to introduce testimony of FB's friends who, according to the evidence at trial, were known to Hearns before he was arrested.[23]  Thus, the

---

[23] Testimony at trial by both SB and BB indicated that they spent time at Hearns' apartment, were known to Hearns, and had conversations with Hearns prior to his arrest.  (Trial Tr. Vol.

defense was in a position to interview these witnesses well before

trial, negating any need for the continuance that Hearns desired

to avoid. Cf. Rashad, 300 F.3d at 40-41 (in evaluating the

prejudice prong of the Barker test, the court noted that to "the

extent that a defendant bears responsibility for causing periods

of delay, . . . any prejudice resulting therefrom is his own fault

and cannot redound to his benefit"). In light of the applicable

precedent, Hearns' contention that he is entitled to habeas relief

---

2, 53-53, 58, 112, 116-118.)  Hearns contends that although he
knew the witnesses, he had no knowledge of the alleged sexual
activity of FB until after counsel had interviewed them and
therefore he is not responsible for the late Rule 100-A motion.
Even assuming this court would accept this argument, it does not
resolve the fact that it is constitutionally acceptable for a
trial court to grant a continuance out of concern for surprise to
the prosecution where proffered testimony falls under the rape
shield statute.  See Lucas, 500 U.S. at 150.

on this claim is without merit.[24]   The court grants the Warden's

motion and denies Hearns' cross-motion on this claim.


**C.    Ineffective assistance of trial counsel**

     Hearns claims that errors made by counsel rendered their

performance constitutionally deficient and provides a basis for

habeas relief.  See U.S. CONST. amend. VI; Strickland, 466 U.S.

668 (1984).  Specifically, he claims that counsel: (1) failed to

interview a number of FB's friends, conduct interviews of other

witnesses in a timely manner, and properly investigate the source

of the silk sheet, (2) failed to file a motion to suppress the

entire contents of Hearns' apartment based on a claim it had been

ransacked by family members before the local police executed the

---------------------------------------

     [24] Hearns makes a final contention that he is not
responsible for the late discovery of the testimony regarding
alternative source evidence because one of FB's friends had
contacted the police about a potential plot to "frame" Hearns
shortly after Hearns was arrested.  He claims, therefore, because
the State allegedly did not follow up on that information, the
defense was tardy in discovering the witness and therefore
"should have been allowed unfettered use of it at trial."  Hearns
Mot. for Summ. J. at 25.  This court disagrees.  Although the
prosecution has a duty to turn over exculpatory evidence to the
defense, see Brady v.Maryland, 373 U.S. 83 (1983), that duty does
not encompass a duty to follow every investigatory avenue for the
benefit of the defense.  Cf. Ellsworth v. Warden, 333 F.3d 1, 6
(1st Cir. 2003) ("evidence is not suppressed if the defendant
either knew, or should have known the essential facts permitting
him to take advantage of any exculpatory evidence" (quotations
and brackets omitted)).  More importantly, the information that
Hearns claims was presented to, and then ignored, by the State
involving an alleged plot by FB to falsely accuse Hearns, was
admitted at trial.

search warrant, (3) failed to properly challenge two witnesses and the DNA evidence, and (4) objected only to one of the prosecutor's alleged misstatements during closing arguments.

It is well settled that to demonstrate ineffective assistance of counsel, a defendant bears the "very heavy burden," Lema v. United States, 987 F.2d 48, 51 (1st Cir. 1993), of demonstrating "that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. . . . [and] the defendant must show that the deficient performance prejudiced the defense." Castillo, 348 F.3d at 11 (citing Strickland, 466 U.S. at 687).  Courts must strongly presume that "counsel's performance falls within the wide range of professional assistance." Kimmelman v. Morrison, 477 U.S. 365, 381 (1986).  When reviewing counsel's performance, a habeas court's review is highly deferential, see Sleeper v. Spencer, 510 F.3d 32, 38 (1st Cir. 2007), and as such, "[t]he habeas court must evaluate the challenged conduct from counsel's perspective at the time, making every effort to eliminate the distorting effects of hindsight." Horton, 370 F.3d at 86 (quotations and ellipses omitted).  To demonstrate prejudice, Hearns must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would be different." Strickland, 466 U.S. at 694; see United States v. De La Cruz, 514

F.3d 121, 140 (1st Cir. 2008).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Sleeper, 510 F.3d at 39.

As a preliminary matter, AEDPA's deferential standard is applicable here.  Although Hearns' motion for a new trial raised numerous federal claims of deficient performance, the trial court denied his motion in a summary fashion.  It did not address each claim individually, but concluded:  "There is no basis for an ineffective assistance of counsel claim as the evidence was so overwhelming that there is no likelihood that counsel's performance would have affected the outcome; however, the court does not find counsel's performance deficient in any way."  State v. Hearns, Nos. 01-S-1189, Order - Mot. for New Tr. (N.H. Superior Court 8/8/05).[25]  As noted supra, mere recognition and disposition

---

[25]  The Superior Court's finding that there was "no likelihood" that the outcome of the case was affected is different from the standard in Strickland, 466 U.S. at 694, that a petitioner needs to show a "reasonable probability" that the errors resulted in a different outcome.  This court is confident that the Superior Court was conducting a federal analysis because Hearns' motion cited Strickland and federal law exclusively.  The Superior Court's use of language more favorable to the defendant ("no likelihood") appears intended simply to emphasize its finding of no prejudice given the evidence at trial.  Therefore, this court will analyze whether the state court applied federal law in an objectively unreasonable manner.  Cf. Malone, 536 F.3d at 63 (because the state court "did not apply a legal rule that contradicts an established Supreme Court precedent," First Circuit conducted a deferential review despite the fact that state court relied on state standard); Sleeper, 510 F.3d at 38 (if resolved under standard more favorable than federal standard, federal court will presume federal adjudication is subsumed).

of the federal claim is sufficient to trigger AEDPA review.  See
White, 399 F.3d at 23.  Deferential review is appropriate even
though the New Hampshire Supreme Court summarily denied Hearns'
discretionary appeal, see State v. Hearns, No. 2005-0644, Order
(N.H. Supreme Court 10/28/05), because in conducting an AEDPA
analysis, courts "look through [to] the last reasoned decision,"
Gunter v. Maloney, 291 F.3d 74, 80 (1st Cir. 2002), in this case
that of the superior court.[26]

　　　Hearns alleges multiple errors by trial counsel.  In the
interest of judicial economy, the court assumes without deciding
that counsel's performance was deficient,[27] yet still concludes

---

[26] Analysis of ineffectiveness is a mixed question of law
and fact, Gonzalez-Soberal v. United States, 244 F.3d 273, 274
(1st Cir. 2001), and therefore, federal courts are not bound by
the state court's conclusions regarding prejudice and competence
to the extent required by 28 U.S.C. § 2254(d).  See Kimmelman,
477 U.S. at 388-89.

[27] The record reveals, however, that Hearns' multiple
complaints of error were either unsupported by the evidence or
were permissible trial tactics on the part of defense counsel.
Thus, the trial court reasonably concluded that counsel's
performance was competent.

　　　The court, however, must briefly dispense with one claim of
error affecting a key piece of evidence:  the satin bed sheet
containing the mixed DNA samples.  Hearns asserts that trial
counsel was ineffective because it failed to file a motion to
suppress the bed sheet on the basis that FB's brother and mother
had access to Hearns' apartment and ransacked it for certain
possessions--other than the bed sheet--before the local police
executed the search warrant that resulted in collection of the
bed sheet as evidence.  Therefore, Hearns asserts that the
evidence was tainted and should have been the subject of a motion
to dismiss.  This argument fails.  First, FB's mother and brother
were not state actors, thus their actions did not implicate

Hearns has not satisfied his burden of showing prejudice.  The
First Circuit has held "that a reviewing court need not address
both requirements if the evidence as to either is lacking.  That
is, if it is easier to dispose of an ineffectiveness claim on the
ground of lack of sufficient prejudice, which we expect will often
be so, that course should be followed."  <u>Malone</u>, 536 F.3d at 64
(citations, quotations and brackets omitted).

To show prejudice, Hearns must establish that but for
counsel's alleged errors, there is a reasonable probability that
the result of his trial would have been different.  <u>See</u>
<u>Strickland</u>, 466 U.S. at 694.  Habeas courts "must consider the

_____

Hearn's Fourth Amendment rights.  <u>See</u> <u>United States v. Momoh</u>, 427
F.3d 137, 140 (1st Cir. 2005).  Second, such activities go to the
weight of the evidence, not the admissibility.  <u>Cf.</u> <u>United States
v. Barandica</u>, 960 F.2d 143 (1st Cir. 1992); <u>State v. Wall</u>, 910
A.2d 1253, 1260 (N.H. 2006).  Third, there was no factual basis
for assuming that the bed sheet was taken or corrupted.  Defense
counsel did present evidence to FB's brother and mother entering
the apartment before the search warrant was executed, but there
was no testimony that a bed sheet was taken.  (Trial Tr. Vol. 2,
33-39.)  Counsel also argued that there were alternative sources
of DNA, (Trial Tr. Vol. 3, 50), that the satin sheet may not have
been on the bed when FB alleged sexual activity, <u>id.</u> at 44-45,
and finally that the sheet was "a mess", and given the number of
people in the apartment, "there was a lot of opportunity for
contamination" <u>id</u>. at 51-52.  Counsel performance is not
ineffective if he does not engage in futile tactics.  <u>Vieux v.
Pepe</u>, 184 F.3d 59, 64 (1st Cir. 1999).  Consequently, I conclude
that counsel exercised reasonable professional judgment in this
context, <u>see</u> <u>Sleeper</u>, 310 F.3d at 39, and find no error.  <u>Cf.</u>
<u>Kimmelman</u>, 477 U.S. at 384-86 (although failure to file a
suppression motion does not <u>per</u> <u>se</u> constitute ineffectiveness,
counsel was constitutionally deficient where he conducted no pre-
trial discovery and there was "a complete lack of pretrial
preparation").

strength of the evidence in deciding whether the <u>Strickland</u> prejudice prong has been satisfied." <u>De La Cruz</u>, 514 F.3d at 140. "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. . . . Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." <u>Gonzalez-Soberal</u>, 244 F.3d at 278 (quotations omitted).

The superior court was not unreasonable in its determination that there was overwhelming evidence of guilt. As noted earlier, the evidence included three mixed DNA samples consistent with Hearns and the victim, <u>cf.</u> <u>Malone</u>, 536 F.3d at 67 (absence of corroborating evidence other than testimony is factor in favor of prejudice), as well as the victim's own detailed testimony about the assaults. Further, in making a prejudice analysis, the First Circuit has indicated that courts should give weight to a jury's determination of credibility, especially where the witness's credibility has been challenged. <u>See</u> <u>Malone</u>, 536 F.3d at 67. Here, defense counsel impeached her credibility with testimony of the alleged plot to frame Hearns and testimony about "parties" at the apartment, even though she denied having them. Still, the jury found FB credible regarding the allegations of sexual abuse. <u>Cf.</u> <u>Malone</u>, 563 F.3d at 67 (finding important that jury found

victim credible despite impeachment in determination of prejudice).

The court acknowledges that in undertaking a prejudice analysis, district courts must decide if any claims of error "would have shaken the jury's beliefs in the essential elements of the government's case at trial." Dugas, 506 F.3d at 9 (quotations omitted). In order to succeed on an ineffectiveness claim, however, it is not enough for Hearns to show that his claims of error had "some conceivable effect on the outcome." Strickland, 466 U.S. at 693. Although Hearns makes multiple claims of attorney error, many of these claims are unsupported by the record or contend that counsel erred in investigating or proffering testimony attacking the victim's credibility that most likely would have been inadmissible or cumulative. See Vieux, 184 F.3d at 64 (counsel not required to make specious arguments). Thus, even assuming that additional testimony may have had a marginal effect on the jury's view of FB's credibility, it would have been unlikely to persuade the jurors to discredit the overwhelming DNA evidence. Accordingly, Hearns has not undermined this court's confidence in the outcome of the trial. See Dugas, 506 F.3d at 9.

Although "unreasonableness may, at times be difficult to define" Malone, 536 F.3d at 67 (quotations omitted), this court concludes that the superior court's finding of lack of prejudice was reasonable. Accordingly, the state court did not unreasonably

45

apply the Strickland standard to this case.  Therefore, this court grants the Warden's motion for summary judgement and denies Hearns' motion as to this issue.


D.   **Consecutive sentences**

The petitioner challenges the legality of the sentences imposed for his AFSA convictions.  See N.H. Rev. Stat. Ann. § 632-A:2, I(j)(1); N.H. Rev. Stat. Ann. § 632-A:10-a (Supp. 2001)(amended 2006); N.H. Rev. Stat. Ann. § 651:2 (1996 & Supp. 2001)(amended 2006), N.H. Rev. Stat. Ann. § 651:3, I (2007).  The petitioner was sentenced to consecutive terms of 20-40 years for two of the AFSA convictions.  For the remaining two AFSA convictions, he was sentenced to consecutive terms of 20-40 years, to be suspended for 20 years from the date of his release.

The petitioner asserts that the state court erred when it imposed the two consecutive AFSA sentences.  Specifically, he claims that these sentences violate federal law because:  (a) the state court lacks statutory authority to impose consecutive sentences, (b) the state court violated his due process right to fair notice because the statue is vague as to whether the sentences may be imposed consecutively, and that due process requires courts to apply the Rule of Lenity in his favor, and (c)

imposition of consecutive sentences violates the separation of powers doctrine.[28]

The procedural posture of Hearns' claims is complex and requires some discussion.  Hearns' claims regarding his sentences were raised in a "Petition to Correct Illegal Sentence or for Habeas Relief" filed in the state court in November 2005.  His federal habeas petition was stayed in December 2005, pending resolution of his state court claim.  The trial court denied Hearns' state court petition and he appealed that decision to the New Hampshire Supreme Court in February 2006.  That court deferred screening of his appeal pending its decision in another case, see Duquette v. Warden, 919 A.2d 767 (N.H. 2007), that presented identical sentencing claims as Hearns.  N.H. v. Hearns, No. 2006-0076 (N.H. March 15, 2006).  Hearns filed a brief as amicus curiae in the Duquette appeal, along with seventeen other amici subject to consecutive sentences, in June 2006.  The New Hampshire Supreme Court, after analyzing all of Duquette's statutory and constitutional claims, upheld the imposition of consecutive sentences in that case in January 2007.  See Duquette, 919 A.2d at 739.  The court subsequently denied Hearns' notice of appeal in April 2007 holding that "[i]n light of the decision in Duquette v. Warden, the notice of appeal is declined."  N.H. v. Hearns, No.

---

[28]  In his petition, Hearns also claims that his sentences were disproportionate.  As discussed supra, Hearns asserts only a state constitutional violation, and thus this claim fails.

2006-0076 (N.H. April 13, 2007)(citation omitted).  The Magistrate Judge lifted the stay on Hearns' claims in April 2007, and directed the parties to proceed on all claims in May 2007.

Hearns' claims derive from the New Hampshire sentencing statutes applicable to AFSA.  See  N.H. Rev. Stat. 632-A:10-a; N.H. Rev. Stat. 651:2; N.H. Rev. Stat. 651:3.  It is instructive, for background purposes only, to review how the relevant statutory provisions operate.[29]  See Creighton, 310 F.3d at 226; McCambridge,

---

[29]  N.H. Rev. Stat. Ann. § 632-A:10-a provides in pertinent part:

Notwithstanding RSA 651:2:

I.  A person convicted of aggravated felonious sexual assault under: . . . (b) Any provision of RSA 632-A:2 shall be sentenced to a maximum sentence which is not to exceed 20 years and a minimum which is not to exceed ½ of the maximum.

N.H. Rev. Stat. Ann. § 651:2 provides in pertinent part:

I.  A person convicted of a felony or a Class A misdemeanor may be sentenced to imprisonment, probation, conditional or unconditional discharge, or a fine.

II.  If a sentence of imprisonment is imposed, the court shall fix the maximum thereof which is not to exceed:

(a) Fifteen years for a class A felony,

(b) Seven years for a class B felony,

(c) One year for a class A misdemeanor.

N.H. Rev. Stat. Ann. § 651:3, I provides that:

A sentence of imprisonment commences when it is imposed if the defendant is in custody or surrenders into custody at that time. Otherwise, it commences when he becomes actually in custody.

303 F.3d at 26 (absent a showing of error, federal courts describe the facts as found by the state courts); DiBenedetto, 272 F.3d at 7 n.1, (even where federal legal claim not adjudicated on the merits, factual findings of the court are presumed correct); cf. Hamm v. Latessa, 72 F.3d 947, 954 (1st Cir. 1995) ("the preliminary question of parsing the state law to determine its substance is not within the primary domain of a federal habeas court").

Both parties agree that the sentencing scheme applicable to Hearns' AFSA convictions does not grant explicit statutory authority to the courts to impose consecutive sentences.[30]  The New Hampshire Supreme Court concluded in Duquette, however, that even though the statutory scheme is silent as to consecutive sentences, the trial court has the common law authority to impose such punishments.  See Duquette, 919 A.2d at 773.  The court reviewed state common law and concluded that "absent statutory dictates to the contrary, [the state] courts have the common law authority to impose consecutive sentences."  Id. at 772.

---

[30]  At the time of Hearns' sentencing, N.H. Rev. Stat. Ann. § 651:2, II-b provided for imposition of consecutive sentences for felonious use of a firearm, specifically that a court must impose a mandatory minimum sentence in addition to punishment for the underlying felony and that this additional sentence shall not be served concurrently or be suspended.  See N.H. Rev. Stat. Ann. 651:2, II-b.

The court further concluded that this authority remained, despite the fact that the legislature briefly revoked the courts ability to impose consecutive sentences.  See N.H. Rev. Stat. Ann. 651:3, III (1974) (repealed 1975).[31]  That statute was repealed shortly after its enactment, and the court in Duquette concluded that since that time, "New Hampshire law no longer specifies whether multiple sentences imposed run concurrently or consecutively."  Duquette, 919 A.2d at 771.  The court examined the legislative history of the repeal, noting in particular that the "legislative history demonstrates that the legislature intended to revive the common law through this repeal."  Id.  The New Hampshire Supreme Court thus concluded that consecutive sentencing was a common law discretionary power of the state courts.  Id.   Thus, this court must now address whether Hearns' consecutive sentences imposed under this sentencing regime were illegal and serves as a basis for habeas corpus relief.

a.    **Statutory authority for consecutive sentences**

Hearns asserts that the New Hampshire Supreme Court erred in concluding that the trial court had the authority to impose consecutive sentences.  The Warden contends that because this issue involves statutory interpretation of a state law, he is

---

[31]  This provision provided that any multiple sentences of imprisonment shall be served concurrently.  See Rev. Stat. Ann. 651:3, III.

entitled to summary judgment as a matter of law.  As discussed
supra, the state court recognized that the New Hampshire criminal
sentencing statues are silent as to consecutive sentences, but
concluded that the courts maintain the common law authority.  The
state court also concluded that although RSA 651:3, III revoked
that authority in 1974, the legislature intended to restore the
courts' authority to impose consecutive sentences with that
statute's repeal in 1975.  Hearns asserts that these conclusions
are incorrect as a matter of statutory interpretation, and
therefore imposition of his sentences violates due process.  The
Warden contends that the New Hampshire Supreme Court's conclusions
are not subject to federal habeas review, and therefore he is
entitled to summary judgment as a matter of law.

It is well settled that federal courts are bound by the state
court's interpretation of state laws, see, e.g., Mullaney v.
Wilbur, 421 U.S. 684, 691 (1975); Rodriguez v. Spencer, 412 F.3d
29, 37 (1st Cir. 2005); Sabetti, 16 F.3d at 19 (on matters of
statutory interpretation state court is "authoritative interpreter
of state statutes").  As such, "the preliminary question of
parsing the state law to determine it's substance is not within
the primary domain of a federal habeas court."  Hamm, 72 F.3d at
954 (citing Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)).

Accordingly, it is inappropriate for this court to engage in
its own statutory analysis of the New Hampshire sentencing

scheme.[32]  Mindful that "it would be unprincipled to declare by
federal fiat that the Due Process Clause broadly nullifies the
[state's] power to construe and apply its laws correctly," Hamm 72
F.3d at 955, the Warden is entitled to summary judgment as a
matter of law on this claim.  Therefore, the court grants the
Warden's motion and denies Hearns' motion.


**b.   Due Process Right to Fair Notice**

Hearns next contends that his sentences are illegal as a
matter of law because they violate the "fair notice" requirement
of the Federal Constitution's Due Process Clause.  U.S. CONST.
amends. V, XIV; see, e.g., United States v. Lanier, 520 U.S. 259,
265-66 (1997); United States v. Batchelder, 442 U.S. 114, 123
(1979); Sabetti, 16 F.3d at 17.

---

[32]   Similarly, in Hebert v. Louisiana, 272 U.S. 312, 316
(1926), the Supreme Court rejected the claim that a state court's
construction of a state law that increased a defendant's sentence
violated due process, concluding:

[w]hether state statutes shall be construed one way or
another is a state question, the final decision which
rests with the courts of the State. The due process of
law clause in the Fourteenth Amendment does not take up
the statutes of the several States and make them the
test of what it requires; not does it enable this court
to revise the decisions of the state courts on
questions of state law.

Accord Hamm, 72 F.3d at 954 (quoting this passage and noting the
continued relevance of Hebert).

This court notes that this issue is properly reviewed under the AEDPA's deferential standard.  In <u>Duquette</u>, 919 A.2d at 773-74, the New Hampshire Supreme Court made clear that the constitutional claims were considered under both the State and Federal Constitutions.  The court cited both federal and state authority relevant to its analysis, and rejected the appellant's claim first under the New Hampshire Constitution and then, concluding that the Federal Constitution affords no greater protection, rejected the federal claims as well.  <u>Id.</u>; <u>cf. White</u>, 399 F.3d at 23 (similar analysis sufficient to trigger AEDPA).  In its order denying the petitioner's notice of appeal, the court indicated that it had considered the petitioner's appeal in light of the <u>Duquette</u> decision.  In keeping with the policy considerations of AEDPA, <u>see</u>, <u>e.g.</u>, <u>White</u>, 399 F.3d at 23, this court infers that the New Hampshire Supreme Court considered the petitioner's claim similarly, thus triggering AEDPA review.  <u>Cf. DiBenedetto</u>, 272 F.3d at 6 (whether a claim is "adjudicated on the merits" is critical inquiry to trigger review).[33]

---

[33] The New Hampshire Supreme Court ruling did not specifically address the petitioner's Rule of Lenity claim.  The rule, however, is one of statutory interpretation, <u>see</u> <u>Sabetti</u>, 16 F.3d at 19, and also is invoked when needed to consider a constitutional due process fair notice claim.  <u>See</u> <u>Lanier</u>, 520 U.S. at 266; <u>United States v. Councilman</u>, 418 F.3d 67, 83 (1st Cir. 2005).  Thus, the court concludes that it was similarly considered and rejected by the New Hampshire Supreme Court and the issue is subject to AEDPA review.  <u>See</u> <u>White</u>, 399 F.3d at 23; <u>cf.</u> <u>McCambridge</u>, 303 F.3d at 35.

The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty or property, without due process of law . . . ." U.S. Const. amend V.  Inherent in this provision is the notion that individuals are entitled to sufficient notice that their conduct is prohibited and could subject them to criminal prosecution and penalties.  See Batchelder, 442 U.S. at 123; United States v. Marks, 430 U.S. 188, 191-92 (1977); Bouie v. City of Columbia, 378 U.S. 347, 350-51 (1964).  "The criminal law should not be a series of traps for the unwary," United States v. Hussein, 351 F.3d 9, 13 (1st Cir. 2003), and as such, due process requires that individuals are entitled to "fair warning in language that the common world will understand, of what the law intends to do if a certain line is passed.  To make the warning fair, so far as possible the line should be clear." Lanier, 520 U.S. at 265 (quotations and ellipsis omitted).  Individuals are entitled to notice not only that their conduct is prohibited, but "sentencing provisions may [also] post constitutional questions if they do not state with sufficient clarity the consequences of violating a given criminal statute." Batchelder, 442 U.S. at 123.

"Fair notice" challenges usually involve three related, but distinct doctrines:  (1) the vagueness doctrine, (2) the Rule of Lenity, and (3) the bar against unforeseeably expansive judicial construction.  See Councilman, 418 F.3d at 82.  Inherent in each doctrine is the claim that a statute is so ambiguous that a

petitioner was insufficiently warned of potential criminal liability.  See id.  "In each of these guises, the touchstone is whether the statute, standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal."  Lanier, 520 U.S. at 266.

First, the court must consider Hearns' claim that the New Hampshire sentencing scheme is unconstitutionally vague.[34]  Hearns claims that he did not receive fair notice because the applicable penalty provisions do not specify whether multiple sentences may be imposed consecutively or concurrently.  It is well settled that a statute is unenforceable if its "terms are so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.  Councilman, 418 F.3d at 84 (quotations omitted).  "Vagueness of this sort raises the possibility that ordinary people will not understand what conduct is forbidden . . . ."  Hussein, 351 F.3d at 14.  "The person of ordinary intelligence . . . should not have to guess at the meaning of penalty provisions, or else those provisions are not sufficiently clear to satisfy due process concerns."  United States v. Colon-Ortiz, 866 F.2d 6, 9 (1st Cir. 1989).

---

[34]  "Vagueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as applied basis."  Hussein, 351 F.3d at 14.

Sentencing statutes must be clear on their face to avoid a vagueness attack.  Id.; cf. Hussein, 351 F.3d at 15 (finding "no ambiguity as might trigger a void for vagueness analysis").  As such, the person of ordinary intelligence must be able to look at the text of the sentencing provision and understand the potential criminal liability.  See, e.g., Sabetti, 16 F.3d at 17; cf. Councilman, 418 F.3d at 84 (looking at text of Wiretap Act, person of average intelligence was on notice of prohibited conduct).

> It is not enough  . . ., for the true meaning of the statute to be apparent elsewhere, in extra-textual materials such as legislative history or analogous statutes.  The idea is that ordinary individuals trying to conform their conduct to law should be able to do so by reading the face of a statute - not having to appeal to outside materials.

Sabetti, 16 F.3d at 17 (quotations, citation, brackets, and emphasis omitted).

Due Process, however, does not require perfect legislative craftsmanship.  "[T]he fact that the architects of the law might, without difficulty, have chosen clearer and more precise language equally capable of achieving the end which they sought does not mean that the statute which they in fact drafted is unconstitutionally vague."  Hussein, 351 F.3d at 15 (quoting United States v. Powell, 423 U.S. 87, 94 (1974))(quotations and brackets omitted).  Mathematical precision is not required and "run-of-the mill statutory ambiguities" will not trigger a due process violation.  See, e.g., Sabetti, 16 F.3d at 18.  "The

person of ordinary intelligence is also a person of common sense,
with knowledge of common understandings and practice which he
brings fully to bear in examining the language of the statute."
Hussein, 351 F.3d at 16 (quotations and brackets omitted and
emphasis added); see, e.g, Jordan v. De George, 341 U.S. 223, 231-
32 (1951).

     The New Hampshire Supreme Court concluded that as a matter of
state and federal constitutional law, the New Hampshire sentencing
scheme satisfies the notice requirements of due process.  This
decision, as applied to Hearns, was not an unreasonable
application of federal constitutional law.  While it is true that
the statute does not specify whether sentences should be served
concurrently or consecutively, due process does not allow Hearns
to turn a blind eye to common legal practices and then assert
constitutionally deficient notice.  See Hussein, 351 F.3d 15-17;
cf. Connolly v. General Const. Co., 269 U.S. 385, 391 (1926)
("[T]he decisions of the [Supreme Court], upholding statutes as
sufficiently certain, rested upon the conclusion that they
employed words or phrases having . . . a well-settled common law
meaning, notwithstanding an element of degree in the definition as
to which estimates may differ . . . .").  Judicial discretion to
impose either consecutive or concurrent sentences has been the
state of the law in New Hampshire since "the beginning of the
Republic."  Duquette, 919 A.2d at 771.  Although that authority

was briefly abrogated in 1974 before it was reinstated in 1975,
see Duquette 919 A.2d at 771-73, it has been the common practice
in New Hampshire to afford judges the flexibility to impose
consecutive sentences for multiple offenses.[35]  Therefore, it is
not unreasonable to conclude that a person of ordinary
intelligence would understand that courts in New Hampshire have
the discretion to fashion punishments for multiple offenses,
occurring over a course of weeks, either concurrently or
consecutively.  See Hussein, 351 F.3d at 15-16 (no undue surprise
for conviction of plant containing illegal substance where common
practice was to prohibit possession of not only chemical, but
plant matter containing chemical as well even if the text of the
statute prohibited only the chemical); cf. Rogers v. Tennessee,
532 U.S. 451, 462 (2001)(judicial abolition of common law "year-
and-a-day rule" did not create undue surprise because of common
practice in jurisdiction).  A person of common sense would not

---

[35]  Although the petitioner in Duquette claimed that the
common law rule was abrogated permanently in 1974, the New
Hampshire Supreme Court disagreed and concluded that the common
law rule was reinstated in 1975.  Duquette 919 A.2d at 772. Even
if we disagreed with that holding, see Hamm, 72 F.3d at 954
(federal courts are bound by the State courts's interpretation of
its own laws unless it invokes a constitutional issue),
consecutive sentencing has been the common practice in New
Hampshire during the thirty-three years since N.H. Rev. Stat.
Ann. 651:3, III was repealed.

suffer such undue surprise in this instance as to render the New
Hampshire sentencing statutes unconstitutionally vague.[36]

Hearns' next claimed denial of due process is that the Rule
of Lenity requires that statutory ambiguity be resolved in favor
of the accused.  The Rule of Lenity, "a junior version of the
vagueness doctrine," Lanier, 520 U.S. at 266, is a rule of
statutory construction mandating that where there is "grievous
ambiguity" in a penal statute, it is resolved in the defendant's
favor.  Councilman, 418 F.3d at 83; United States V. Ahlers, 305
F.3d 54, 62 (1st Cir. 2002).  It "ensures fair warning by so
resolving ambiguity in a criminal statute as to apply it only to
conduct clearly covered." Lanier, 520 U.S. at 266; see, e.g.,
Batchelder, 442 U.S. 121-22.  The Rule of Lenity is properly
applied by a court only when the asserted ambiguity is "grievous."
Councilman, 418 F.3d at 83.  The mere existence of some ambiguity
is not sufficient to warrant its application.  Id.  "[M]ost
statutes are ambiguous to some degree, . . . . [therefore] lenity

---

[36]  Hearns also asserts that a person of ordinary
intelligence would understand N.H. Rev. Stat. Ann. § 651:3, I, to
mandate that multiple sentences be served concurrently.  This
argument is without merit.  The text of this provision, see supra
note 29, reveals that it pertains not to the question of whether
sentences are consecutive or concurrent, but rather how to
determine commencement of service for purposes of computing the
time actually served by a convict.  The title of that provision
"Calculation of Periods" makes this clear.  Thus, Hearns has no
foundation on which to mount a fair notice challenge.  See
Hussein, 351 F.3d at 15 (finding language unambiguous and thus
not subject to vagueness analysis).

applies only if, after seizing everything from which aid can be derived, a court can make no more than a guess as to what [the legislature] intended.  Id.  (Citations and quotations omitted.)

    In invoking the rule of statutory construction, Hearns again fails to realize that this court is bound by the state court's construction of state law unless such construction is offensive to the Constitution.  Sabetti, 16 F.3d at 19; see Hamm, 72 F.3d at 954; Lurie v. Wittner, 228 F.3d 113, 126 (2d Cir. 2000)(noting First Circuit rule that federal courts cannot apply Rule of Lenity to state statute unless it is unconstitutionally vague or otherwise fails to give fair notice); cf. Perez v. Campbell, 402 U.S. 637, 644 (1971) (where state supreme court has construed statute and consistently adhered to this construction, United States Supreme Court is bound by its rulings).  Because there was no fair notice violation, it is inappropriate, and indeed this court lacks the authority, see Sabetti, 16 F.3d at 19, to apply the Rule of Lenity to the New Hampshire sentencing statutes as challenged.  See id. (concluding that "[w]e have no power to apply [the rule of lenity] to a state statute" because the state court "is the authoritative interpreter of state statutes.")[37]

---

[37]    Indeed, even if this court could properly apply the Rule of Lenity in this case, it would be inappropriate because the statutory ambiguity present in this case is not "grievous".  The legislative history pursuant to the repeal of RSA 651:3, III, reveals that the clear intent of the legislature was to give courts the flexibility to impose consecutive sentences.  See Duquette, 919 A.2d at 771.  It is well settled that where the

This court, therefore, concludes that the New Hampshire
Supreme Court properly determined that Hearns was not denied his
due process right to fair notice when he received consecutive
sentences pursuant to the New Hampshire sentencing statutes.  The
court grants the Warden's motion for summary judgment on this
issue and denies Hearns' motion.


**c.   Separation of Powers**

Hearns' final argument is that the New Hampshire sentencing
scheme violates the separation of powers doctrine of both the
state and federal constitutions because, he claims, "[j]udicial
design of a cumulative punishment, exceeding that expressly
granted by statute, is a form of substantive law-making
Constitutionally reserved to the Legislature."  The New Hampshire
Supreme Court rejected a similar claim on state constitutional
grounds in Duquette, 919 A.2d at 775, see N.H. CONST. part I, art.
37, concluding that "[b]ecause no usurpation of essential
legislative functions has been effectuated, the separation of
powers doctrine has not been violated."  Duquette, 919 A.2d at
774.  The Warden contends that this issue is not subject to

---

legislative history makes the statute clear, the ambiguity is not
grievous and lenity is unavailable to the court.  See Councilman,
418 F.3d at 83, relying on Reno v. Koray, 515 U.S. 50, 65 (1995);
Dixson v. United States, 465 U.S. 482 (1984).

federal court review and thus the Warden is entitled to summary judgment as a matter of law.

First, as discussed supra, it is inappropriate for this court on habeas review to examine matters of state law. See Evans, 518 F.3d at 5; Hamm, 72 F.3d at 954. Accordingly, the Warden is entitled to summary judgment as a matter of law on Hearns' state constitutional separation of powers claim.

Second, with respect to Hearns' separation of powers claim on the basis of the Federal Constitution, it is well-settled that "the concept of separation of powers embodied in the United States Constitution is not mandatary in state governments." Sweezy v. New Hampshire, 354 U.S. 234, 255 (1957). Thus, the states are free to allocate powers amongst the various state branches of government as they please. Minn. v. Clover Leaf Creamery Co., 449 U.S. 456, 463 n.6 (1981).

> Whether the legislative, executive, and judicial powers
> of the state shall be kept altogether distinct and
> separate, or whether persons or collections of persons
> belonging to one department may, with respect to some
> matters, exert powers which, strictly speaking, pertain
> to another department of government, is for the
> determination of the state. And its determination one
> way or the other cannot be an element in the inquiry
> whether the due process of law prescribed by the 14th
> Amendment has been respected by the state or its
> representatives when dealing with matters involving life
> or liberty.

Dreyer v. Illinois, 187 U.S. 71, 84 (1902). As such, this court cannot disturb Hearns' sentences on the ground that they violate the federal separation of powers doctrine. See generally, 16

62

C.J.S. <u>Constitutional Law</u> § 216 (2008) (separation of powers doctrine in the Federal Constitution is not enforceable against the states as a matter of constitutional law).  Summary judgment is granted in favor of the Warden and Hearns' corresponding motion is denied.[38]


**E.   <u>Hearing</u>**

Finally, Hearns requests a hearing before this court. Because no factual issues exist that would require a hearing, his motion is denied.  <u>See</u> 238 U.S.C. § 2254(e); <u>see</u> <u>also</u> Rule 8(c), Rules governing § 2254 Cases; Local Rule 7.1(d).

---

[38]   Hearns also asserts that his sentences are illegal because New Hampshire's sentencing laws violate the state constitutional mandate against disproportionate sentences.  <u>See</u> N.H. CONST. Part I, art. 18.  The New Hampshire Supreme Court rejected this claim in <u>Duquette</u>, 919 A.2d at 774, concluding that "the petitioner has failed to persuade us that the sentencing scheme is unconstitutional because it necessarily results in sentences that are grossly disproportionate to the crime." <u>Id.</u> (quotations omitted).  The Warden claims that this issue is not properly before the federal court and therefore he is entitled to summary judgment as a matter of law.

"[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a [sentence] violated the Constitution, laws, or treaties of the United States." <u>Estelle</u>, 520 U.S. at 67-68.  In this matter, Hearns asserts only an error of <u>state</u> constitutional law, and it would be inappropriate for this court to disturb the finding of the New Hampshire Supreme Court on such matters. <u>See</u> <u>Evans v. Thompson</u>, 518 F.3d 1, 5 (1st Cir. 2008). Therefore, this court agrees with the Warden and grants summary judgment in his favor on this issue and denies Hearns' motion.

**IV.  Conclusion**

In the context of deciding the parties' motions for summary judgment, this court has carefully reviewed the claims made in the motions, the applicable legal standards, and the record.  No factual issues exist in this case that prevent a decision on the merits at this time.  As is discussed in detail above, to the extent the state court addressed the issues Hearns raised, that decision is not contrary to federal law as established by Supreme Court precedent.  With respect to the issues the state court did not address, which were reviewed de novo, Hearns' conviction is not in violation of his federal rights.  Therefore, Hearns' petition for a writ of habeas corpus is denied.  Hearns' motion for summary judgment (document no. 22) is DENIED, and the Warden's motion for summary judgment (document no. 21) is GRANTED.  All other pending motions are denied as moot.  The clerk shall enter judgment accordingly and close the case.


**SO ORDERED**

_____
Joseph N. Laplante
United States District Judge


Dated:  September 30, 2008

cc:  Dwayne Hearns, pro se
     Susan P. McGinnis, Esq.

64